May it please the Court. This case requires a straightforward application of this Court's sovereign immunity case law. Two of the defendants, the Governor and the Attorney General, do not even enforce the challenged laws, so they are improper defendants. And the Insurance Commissioner has taken no steps to enforce the laws against the plaintiffs, so she's an improper defendant too. What plaintiffs are really seeking here is an impermissible advisory opinion regarding the constitutionality of the challenged laws. Okay. Assuming, arguendo, that we agreed with you regarding the Governor and the Attorney General that they're not part of this enforcement mechanism under our case law, but we disagreed about the Commissioner Brown, would we modify the injunction? What would happen? Well, first, I mean, the Governor and the Attorney General would be dismissed, or you'd direct the Court to dismiss them from the case. Right. But what do we do with the . . . If you disagree on the Commissioner, I mean, then we get to the issue of the preliminary injunction, but . . . Right. No, but so we would just modify the injunction if we thought that she was right and you lost on all your arguments. I'm not foreshadowing. I said it was just . . .  We would just say it. We'd just take out the part about them. Sure. Right. If that's the only . . . Ask the District Court to do that. Sure. Yeah. Okay. But the case should have been dismissed. What do we do with book people? Well, book people . . . Why is her different duty to enforce the statute here different than our decision in book people? In book people, the Defendant Commissioner had affirmative duties relating to enforcing the statute. He was required to collect certain disclosures, post them, so he had affirmative obligations that could be enjoined. There's nothing similar here. The plaintiffs are just asking us to not enforce the statutes against them, meaning take some kind of prosecutorial type action, but there's no similar affirmative . . . Doesn't it chill speech to have it sitting out there and not know whether they're coming for you and it's in the core speech area? No, that's their key argument, but this case . . . the Court's decision in the National Press Photographer's case, which we cite, it makes clear that even if standing requirements like having chilled speech, even if they are relaxed for the purposes of standing on a pre-enforcement challenge like this one, the case makes clear that the plaintiffs must still provide some evidence that the defendants are going to enforce the statutes against them in order to satisfy Ex parte Young, which is a separate issue based on . . . In National Press, there was a history of non-enforcement almost a decade long, correct? The statutes had been in existence for much longer than this one, but . . . Okay, so here, there is no history of non-enforcement here because it's too recent. Because there couldn't be, correct. Would you agree you could sell the list yourself right here, right now as an attorney under our existing law if you were to give an express stipulation that pending the appeal, it wouldn't be enforced, but this record reflects that no one has ever given that, correct? There has been no informative action at all, and so there . . . I mean, I don't . . . just because those statutes have existed for a long time, it's . . . No, those are two questions. There is no history of non-enforcement is one you've agreed, and then second of all, under existing Fifth Circuit law, if you were here to stand in front of us or in any formal stipulation, the commissioner said, you're right, I'm not an Ex parte defendant because I will not enforce this until it gets anchored, answered, but you're explicitly on this record not doing that. That's correct, but I don't think that's enough for them to get past her immunity. So, you're having your cake and eating it, too, somewhat, are you? Well, no, if the commissioner goes . . . Because you won't stipulate that during the pendency of the appeal, you're not going to be trying to enforce this, so there might be a need for an injunction, then. Well, it's their duty to point to some sort of affirmative action first . . . A scintilla. A scintilla, that's right. And I thought the case law said, when you have language that says from the legislature, you shall, no one else, this is not a case where there's uncertainty as in whole, eventually, in whole women's health. This is really precisely the statute saying you shall enforce this. If they find a violation, but the commissioner hasn't . . . If they find a violation. If the commissioner believes that there's some sort of violation of the law . . . Okay, but that's admitting, to me, that's just admitting the game here right now. If she believes there's a violation, she intends to . . . But there's no record that she's going to do that . . . Okay, so your argument turns on them not having plans in 2024. In other words, that's what you're saying. She can't be an ex parte defendant because there is no violation. It's not that she doesn't have a credible threat out there that she's going to follow her law. We don't know whether they or anyone else is going to . . . But what case says in the First Amendment pre-enforcement context, you can have an official that acknowledges she's the one that's told she shall enforce it, and then sort of cleverly she says, I'm not going to tell you if I will or won't, and then they're stuck. I mean, I think the National Press Photographers is our best case on this point, and I understand that there's more . . . there was a history of non-enforcement, but again, we have no enforcement also. I think they're on equal footing when it comes to ex parte young. They need to point to a scintilla of positive evidence that we are going to enforce . . . But you aren't disputing the letter that's in the district court record that reflects a complaint was made saying enforce 1696. So that letter had nothing to do with the provisions that are being challenged. Well, it says enforce, follow the law, 1696. What that letter says . . . they point to a letter that asks VSP, one of the plaintiffs, to respond to an optometrist complaint about VSP's failure to provide contact information so that the optometrist could find out about out-of-network benefits. That has nothing to do with the statutes that are at issue in this case. Well, it shows that the Texas Department of Insurance, receiving a complaint to . . . about VSP, will say to them, you have to respond according to Texas law. It's a consumer complaint, and the complaint specifically says, quote, follow the law, 1696. But 1696 is much broader than . . . Okay, so she's . . . she'll enforce portions of it pursuant to the duty, but you're just saying, even though she won't say she won't enforce these two, we should just be confident that the anti-steering portions aren't going to be enforced. Well, no, I think the point is so that some sort of concrete dispute has materialized so we can see, will the commissioner enforce the laws because they believe, there's reason to believe there's been a violation, and that we're not at that point yet. You're not trying to say that a discreet, threatened enforcement action is required under Ex Parte Young, are you? Something . . . it can be less than that. There could be a bulletin, we're going to enforce the laws in this way. There could be, respond to this complaint, someone says you're violating these provisions of the law. But they have to take an affirmative step to say they're going after people, either in general or particularly. You're saying they have to do that? Some affirmative step. Refusing to stay a non-existent action is not . . . Okay, what do you do with her case in Mi Familia v. Aug? Why isn't the statutory delegation of a mandatory enforcement duty to an officer sufficient to meet our standard of only some scintilla of action by a state official? Doesn't Mi Familia indicate that that is enough when you have a statutory delegation of a mandatory duty to the proper officer? Here the commissioner has, her job is to take all reasonable steps to enforce the statute, so there is some discretion built into how the statute is . . . Are you saying it would be unreasonable to enforce the statute? And if so, then why are you not agreeing that they're not going to enforce the statute if it would be unreasonable to do so? I'm not saying it's unreasonable to enforce the statute, but that you have to look at the facts of each case to, she'll need to determine whether someone is violating . . . Okay, so the fact that she can only do reasonable things in her mandatory delegation, that still doesn't really distinguish you from Mi Familia, does it? It means that she has some discretion in interpreting what the statute means. Can you address that case, please? The Mi Familia case? Yes. Are you not familiar with the Mi Familia? I've read it, but it's been a while, and so . . .  Thank you. Well, I agree with Judge Elrod. That's a really important case, and maybe when you stand back up, footnote 13 is the one I'm zeroing in on. Sure. She said, I won't enforce it. It's easy. The official can say, I won't. You remember that. Yeah, sure. I remember that, and if that's . . . In the footnote, our court said, if she reneges on that, you are . . . you can come back, sue the person. And we would agree, if the commissioner took active steps towards some sort of action against the plaintiffs here, that they would then be able to sue the commissioner, but you need to wait for that to happen. That's the point. No, but the footnote I'm drawing your attention to is not an active step. It's a reneging. Right? The key thing is, Texas officials can say, I mean, opposing counsel will get up and disagree, but it looks difficult for the governor and the attorney general, just the duty to take care, but now we've got Texas saying to this insurance commissioner, this is your job. You shall. And unlike me, Familia, she isn't doing what Commissioner Ogg said, which is, I promise, I'll wait until the appeal's out. That would be a stronger case, but I don't believe that that is dispositive, because again, I think it's their duty to have shown some affirmative step first . . .  A scintilla, yes, and I don't think they've met that here, but I guess, if I should turn to the . . . Before you do, how would someone, in a pre-enforcement context, when there's been no enforcement, what can they show as a scintilla of enforcement? Well, like, something like what, the letter they point to, if it had been about the statutes that are at issue in this case, if it had been about those provisions . . . That's really putting Texas companies at risk. Well, again . . . I mean, you're saying, you better, we are enforcing other provisions, and I'm not telling you we won't enforce this, but good luck, you might find yourself in a violation. The Supreme Court has recognized that when commercial speech is at issue, which it is here, there's a profit motive to continue business and speak that makes the chill a little bit less concerning than it is in a non-commercial case. So that's part of the answer to your question, I believe, but we believe the defendants retain immunity because they have not, again, met that scintilla standard, so we don't think the court should even reach the plenary injunction issue, but I'll address them in case the court does disagree about immunity. The plaintiffs failed to show a likelihood of success on their First Amendment Association claim. The statutes that they're challenging, that's 1451.153A4 and A5, they have no bearing on anyone's ability to join or participate in any group. At most, subsection A5 restricts managed care plans from encouraging insureds or consumers from buying products or services from . . . Let me just, because we did ask you, I asked you a lot of questions, so your time's limited, but I thought when I read your brief, especially footnote three, you're not trying to make a central Hudson defense. You're saying we should ourselves narrow the possible. Is that correct? Turning to the speech claim, yes. I was addressing association first. Oh, you were going to association first. Yes. Oh, no, that's fine, but we don't think that the laws bear on association at all. So turning to speech, yes. We were not at the point where we would meet intermediate scrutiny. That would need to be addressed on remand, but we believe you don't get that far because you can narrowly construe the statutes to apply only to inherently deceptive speech. Why would we deal with intermediate scrutiny on remand? Why would we? Yeah, why would we have to remand to deal with whether or not this is . . . Well, no, I'm sorry. I mean, if you disagree with us and think intermediate scrutiny applies, then yes, you would preserve the preliminary injunction, and then we would have the opportunity to meet intermediate scrutiny on remand, yes. But we're saying that you don't need to go that far because the statutes can be read narrowly to apply only to inherently deceptive speech. Okay, well, I have a question about that. If the statute aims only to prohibit plans deceptive identification of optometrists, then why didn't the legislature include that qualification in the statute? Texas has a number of statutes that specifically prohibit deceptive or misleading, in fact, commonly named deceptive in the very articulation of those statutes. That word is not here. I can't speak to why they did or didn't include certain words, but what I can say is that the plaintiffs have conceded that the statutes are vague, and that generally means that they're susceptible to a narrowing construction that's offered by the government, and we are offering a construction that is reasonably tethered to the words of the statute, where, and especially in this context— What is ambiguous about the statute's prohibition on a managed care plan identifying an optometrist that participates in the plan differently from another optometrist? That's not ambiguous at all. Well, whether that—I mean, that could be broadly read or it can be narrowly read to only apply to something that's inherently deceptive. I would have done the exact same in Allstate, but we didn't. Is that just because we weren't asked to? Allstate—well, there's two— That was an anti-steering— Sure. Allstate, you weren't asked to, which we pointed out, first of all, but secondly, Allstate didn't involve some of the immunity issues that are at issue in this case because— We're putting immunity to one side. Sure, but yes. If the statute didn't prohibit only false and misleading speech, would it still be constitutional? Pardon me? If it didn't prohibit only—if it didn't have this narrowing construct, would it be constitutional or not? That's what intermediate scrutiny is all about, and we would— I want you to answer the question. Well, I can't yet because that requires some kind of a record, so I'm— The government should know whether their statute is unconstitutional if they don't have a false or misleading requirement. It shouldn't require the court—you should have a position on that. We obviously believe that it's constitutional. Even if it doesn't require false or misleading? Yes, but we would need to— Okay, so you believe it's not—you could be constitutional even if it didn't require false and misleading? Yes, but we would have to meet intermediate scrutiny. If we rewrote the statute and put in only misleading, who would be the person deciding whether something's buffering versus misleading? I mean, the commissioner in the first instance. Let's see if my time is up. No, stay for a while, please. I'll give you a couple extra minutes. Okay, well— Keep talking. What would change about Texas's enforcement of this statute if we were to narrow the scope of the preliminary injunction to only false or misleading commercial speech? If we were to narrow the scope of the injunction and say this applies this to this and that this is the only thing you can't do, how would that change anything? Well, it would mean that we could enforce the statute in a constitutional fashion. Like if there are— But you already told me it was constitutional either way. Well, if you narrowed it to make sure that it only applied to deceptive speech, we could go forward immediately and enforce it against things that the commissioner believes in the first instance constitute deceptive speech. So— What is VPS doing that is—what are they saying when they recommend and tie-ins, say these people will give you discounts? Well, again, their speech is not an issue on this particular—but—pardon? Sorry, I missed—it's VSP. VSP. But what could be inherently deceptive is steering someone to an optometrist under some sort of identifying mark or encouraging words that make them sound like they might be the best or the cheapest when consumers don't realize that there's an affiliation between the parties. If we were to decide that the statute is not facially unconstitutional—that's a friendly assumption on this hypothetical—should we reach whether it is unconstitutional as applied to—this is related to the question Judge Hickinson's asking—as applied to the Vision Service Plan's Premier EDGE program? I don't think—well, no, because if the statute is read narrowly to just only apply to inherently deceptive speech, then it's going to be constitutional as applied or facially unconstitutional. Because either their speech, if it's deceptive, would not be protected by the Constitution, and if it's not deceptive, then it wouldn't be covered by the statute. So you would hold that it's constitutional both as applied and facially, the way we're offering. I'll just briefly touch on the Equal Protection Claim. They failed to make any effort to show that the parties are similarly situated to the general health care vision—or, sorry, the general health care industry, which was their burden. But even putting that aside, this is a rational basis claim. The legislature was patently rational in concluding that restricting managed care plans from identifying and promoting certain favored optometrists over others could help foster transparency and fair competition. Thank you. We have your argument, and you saved time for rebuttal. May it please the Court, Chris Cradivel on behalf of the plaintiff's appellees in this case. And I'd like to go straight to sovereign immunity, since that's where the Court spent the bulk of its time when my friend on the other side was up. Your Honor, you're absolutely correct that this case is on all fours with Book People v. Wong. Of the cases in the sovereign immunity context where there is a pre-enforcement challenge that's been brought, this case is very similar to Book People v. Wong, in which sovereign immunity was found not to preclude this Court's jurisdiction. If you think about Abbott and Paxton, under our precedent, don't you have a hard time with Abbott and Paxton? Your Honor, we do. In candor to the Court, we were perhaps over-inclusive in designating defendants. We did that out of an abundance of caution. The Commissioner of Insurance is indisputably a proper defendant here and has acknowledged her shall obligation to enforce this law. We'll stand on our briefing with regard to the Governor and the Attorney General, but the key point for today's purposes is that there is a proper defendant, the Commissioner of Insurance in the docket, who is tasked with the enforcement of this law. In the commercial speech, pre-enforcement context, you may have a spectrum of positions, but I'm looking at who has the burden of showing a likelihood of enforcement, and what is the nature of the burden? Is it a scintilla? Is it a credible threat? Is it a demonstrated willingness? If you can cite Supreme Court or Fifth Circuit law, that'll help. Absolutely, Your Honor. This is a bit of a confusing area of this Court's jurisprudence. The current standard separates standing from sovereign immunity, though it says there's a lot of overlap as between those two. The case I would direct you to is this Court's 2020 opinion in Speech First v. Fenves. This was the UT, University of Texas, speech code case in which Judge Jones held that there was a substantial overlap between . . . So, let's assume there is an overlap. Whose burden is it, and then what is it? Well, consistent with Book People v. Wong, as well as Mia Famiglia and National Press Photographers Association, this Court's current jurisprudence as to not standing but sovereign immunity indicates that it's my client's burden to come forward. It's a low burden or a light burden of a scintilla of evidence of intent to enforce. I think we've . . . Easily now, I agree with you so far, scintilla of evidence of, but then you said intent to  Yes, Your Honor. Is it useful to use phrases like credible threat or demonstrated willingness? Certainly those come up in the standing context, and insofar as this Court's jurisprudence teaches us that standing and sovereign immunity are sort of two sides of the same coin, they are useful. This Court's recent, in this decade, precedents in the sovereign immunity context tend not to use those type phrases. Oh, it's a scintilla of evidence of an intent to enforce. It's a little hard to prove a negative. She's saying, I won't say whether I will or won't enforce. Well, Your Honor, if the Commissioner's position were to prevail on sovereign immunity today, I fear it would be the end of pre-enforcement challenges on First Amendment grounds as the But do you agree, I mean, I'm interrupting just because your argument's lucid and I'm following you, therefore I'd move to the next question. If she, even through her attorney today, were to stand up and say, pending the appeal, we won't, I think under our law at that point there wouldn't be an ex parte defendant. I think that would functionally be the equivalent of a preliminary injunction. That's what happened in the Ott's case. So we're in the world of officials saying, I've got a director from, I'm the one that enforces these, but I'm not going to say whether I will or won't, but if you look out there, we haven't. In National Press Photographers Association, there was a more than decade long period in which the law that was being challenged had never been enforced. That's obviously very different than the context of this case where this lawsuit was filed before the law went into effect. Is it worth relying on whole women's health or should we just put that off to one side? I would advise putting it off to one side, Your Honor, that I think it's important for defendants or for plaintiffs who are seeking to protect fundamental First Amendment rights to be able to come forward on a pre-enforcement basis. And there's a quote from the first speech, the Fenvey's case, that I would direct the court to. And it's quoting a Seventh Circuit opinion favorably, but we're adopting it as Fifth Circuit law. It reads, quote, a plaintiff who mounts a challenge on pre-enforcement statutory grounds need not show the authorities have threatened to prosecute him. The threat is latent in the existence of the statute. That's 979F3. Latent in the existence of a statute that includes mandatory terminology? Is that crude? So, importantly, I don't want to in any way mislead the court. This is in the standing analysis. But a few paragraphs later, we, excuse me, in Book People v. Wong, this court comes back and says the standing analysis substantially overlaps with the sovereign immunity analysis. So I think this is, in terms of a pre-enforcement challenge, an important principle. But even if we're held to that scintilla standard, Your Honor, I think we've easily met that here in three different ways. Way number one, it's at record 220 through 222. At the outset of this litigation, we asked for a Mia Familias v. Ogg style stipulation that they would not enforce. At record 222, the Commissioner's counsel says, no, we will not give you that stipulation. We come back, leading in to what was going to be the temporary injunction hearing in March before the district court decided that it could do this as a matter of law without an evidentiary hearing. Can we consider that conduct? The fact that you say, you know, we're not going to do that, even though it would save us lots of time and money, can we consider that in saying, well, that might be some scintilla that they're on the verge of doing this any day of the week? Exactly, Chief Judge Elrod, I believe that's... Even conduct in the litigation, could that be considered legally? It certainly was in Ogg, where the stipulation given during litigation was really dispositive on the sovereignty. So the fact that they're saying, no, we're not interested in your deal, that tends to show that they might, at any moment, pounce. Absolutely, Your Honor, it's an intent to enforce, and we gave them a second chance to take that. And pounce is not meant in a pejorative state way, that if that's their legal right to do so, then perhaps they can. I believe Your Honor gave my friend on the other side the opportunity to make that stipulation from the microphone a few minutes ago, and he did not offer that stipulation, just as they did not offer it when asked at R220 through 222, and again at R604 through 606. So they had two chances to stipulate on the record in an Ogg-style non-enforcement decree. They didn't do it. That puts us in reasonable fear of enforcement, and if that wasn't enough, if that wasn't a scintilla... Again, a scintilla is a low standard and a light burden. That March 1st, 2024 letter from the Texas Department of Insurance, from the commissioner to Plaintiff Appellee VSP, asking for a response on alleged violations of 1696, I think that alone, without more, would be a scintilla. That's the equivalent of a target letter in a criminal matter. They're saying, we're looking at you, we're investigating you, you need to respond within 15 days. So it's a little confusing, Your Honor, it's in the district court record, at district court docket number 66. You could have just transmitted that, or we still could, if there's no motion to supplement, it's in the record. Your Honor, it's before the district court, and we put it before this court, I believe, as an exhibit in some of the motions practiced before this court on a motion to abate, but I don't think there's any reasonable denial from the other side that this letter exists. These three things you're listing, we've let you get through two. You're saying it's independently equivalent to scintilla. Yes. So the first is a refusal to answer an OGG stipulation. Correct. Negative implication from refusal, that's scintilla. Second would be, we've got a letter, even if not in the particular provision, it's from this commissioner about this piece of legislation. Also correct. So the third would be, it's at 604 through 606 of the record. This is an exchange in which we give counsel another chance to enter into an OGG style stipulation. They don't. But we also, because we're heading in at that time to a temporary injunction hearing, we ask for the commissioner's deposition so that we can ask her if she intends to... That's a third example of the first. Yes. I thought, would the third sufficient equivalency to scintilla be the mandatory language in the statute under our authority? Yes, Your Honor. I think consistent with the quote that I read to you from Speech First v. Fenves, the mandatory nature of enforcement, the shall obligation that the commissioner of insurance is operating under is, again, as in book people, that in and of itself is a scintilla. So I know... But that deposition did not take place? It did not, Your Honor. Why did that deposition not take place? They said it was an Apex deposition and they would not offer her up for deposition. They said they would quash it, but... So you all just let that go? No, Your Honor. The district court intervened by issuing the temporary injunction without the hearing. So the temporary injunction came down while we were positioning and preparing discovery for the temporary injunction hearing, or preliminary injunction, I should say, using state court terminology, and I apologize. I don't know if we've had enough on the sovereign immunity and that sort of thing, but can you please address the narrowing, the scope of the injunction to prohibit false and misleading? Absolutely, Your Honor. Well, first and foremost, that narrowing construction was never put before the district court. That is offered for the first time on appeal. That is something they have come up with not at the 11th hour, but the 13th hour on appeal. The district court was not given the opportunity to evaluate that. That is a hail Mary to try to save this statute on appeal. Does the statute itself, or does Texas generally have a severability statute, and have they invoked it? Texas generally has a severability statute. I defer to my friend on the other side if they have invoked it. I don't recall that they have, however, Your Honor. And again, we have not challenged the whole of 1696, nor has the district court preliminarily enjoined the whole of 1696. The district court's injunction is specific as to the provisions of 1696 that have been enjoined, and I don't think there's any dispute that there's adequate specificity as to what's been enjoined here. But in addition to this narrowing construction coming for the first time on appeal, it's immensely problematic, Chief Judge Elrod, for the reasons that you identified and some of you were questioning to counsel on the other side, which is there is nothing in the text of 1696, nothing in the plain language of 1696, that limits it to false or misleading or deceptive speech. And certainly the Texas legislature knows how to limit itself to false, misleading, and deceptive speech when it wants to. The Texas Deceptive Trade Practices Act, for example, would be one example of a Texas statute that enjoins not speech across the board, but deceptive, misleading commercial speech. There are other examples, too, of course. The purpose, I mean, to the extent this, we can look at what this statute's about, it's a preference to independent optometrists over vertically integrated optometrists and plans, isn't it? It's economic regulation. That's exactly correct. It's not about consumer protection, it's economic regulation, right? Ironically, it limits the amount of information that goes to consumers, and you're absolutely correct. And that might be, I might turn around and ask you, that's not necessarily completely friendly, why isn't that a legitimate interest that Texas could choose to preference its non-vertically integrated and want to have the mom and pop, you know, standalone optometrists have a leg up? I would direct, Your Honor, to the United States Supreme Court's holding at Thompson v. Western States Medical, which is 535 U.S. 357, 10.374, where it talks about economic protectionism of this sort, where you're favoring one class of competitors engaged in a lawful business over another class of competitors. Is this like the Abbey case with the caskets or whatever it was, the burial case? Exactly, Your Honor, and I'd also— And that was irrational, wasn't it? I would agree with Your Honor. No, I mean, didn't we hold that it was irrational, or did Judge Hickenbotham, or I can't recall at the moment. My recollection, and my north star here, my general rule, is that consistent with Thompson v. Western States Medical and a host of other cases, including this court's Allstate v. Abbott case, raw economic protectionism is never a valid government interest. When you're favoring one class of competitors over another class of competitors, that is not a valid governmental interest. But even if that were a valid governmental interest, I think when we transition into the central Hudson gas and electric three-part test for limitations on commercial free speech, even if the government somehow, giving them every benefit of the doubt, has an asserted government interest that is substantial, and I don't think they do, I think they have raw protectionism here, and I think the legislative history, 25 comments from independent optometrists, all identical, all asking for protection, I don't think that's a substantial government interest. But giving them the benefit of the doubt. When we go to two and three in the Hudson gas and electric test, two is whether the regulation directly advances the governmental interest, and three is that the regulation is not more extensive than needed to serve the government interest. They fail both of those prongs. Why? Because it doesn't directly advance the governmental interest. This is a restriction on speech, not a restriction on the business model. The direct way to legislate here would be if they were to prohibit this business model. That would be a different bill. That would be a different case. That would probably be a different challenge from my clients. The statute technically would cover deceptive speech. It could, Your Honor, but this... But if it does, does that make it difficult to facially invalidate? I think it's a much more difficult facial challenge, but happily we don't have that problem here because they've engaged in a naked facial restriction on speech that is truthful and about a lawful business, and with nothing in the text of the bill to indicate that deception or consumer confusion or anything like that is targeted. It flat out targets the ability of vision insurers like VSP to communicate to their insurers like plaintiff... Excuse me. The statute, as written, prohibits you even from mentioning there's some discounts out there? That is how we are complying with it. But the point they raise factually in the record, in the brief, is that you have no plans at all for 2024. Do you recall that point? I do, and I would disagree with that. And first of all, this preliminary injunction was issued by the district court as a matter of law without a factual hearing, because I think the facts are essentially undisputed here. But there are three affidavits from the chief operating officer, Ms. Healy, of VSP talking about their plans going forward and how they've had to modify their business in response to this law. And I think in the unlikely event that a remand were necessary for a factual hearing, that is something that would be amply brought out at a factual hearing. I see the narrow question in that way is you're here representing VSP. I'm representing the plaintiff appellees collectively, but my friends over there each have their own counsel. I was just given the task of speaking for everyone. Okay. But do you care to speak if no one else is going to speak? How are the other plaintiffs subject to this? It's fairly easy, and as we were a little over-inclusive, perhaps, with our defendants, we've also tried to be over-inclusive with our plaintiffs to make sure there is not a standing or justiciability problem here, Your Honor. So I think it's fairly simple. Plaintiff appellee VSP and the other members of the National Association of Vision Care Plans, which is the industry trade group, Association for Vision Care Plans, are prevented by HB 1696 from communicating truthful, cost-saving, beneficial information to their members, such as Plaintiff Appellee Bobby Montgomery, who is an individual member of VSP, as well as to the members of the Healthy Vision Association, HVA, which is an association of members of vision care insurance plans. They are here as an association. And Mr. Montgomery and the members of HVA have a First Amendment right to hear and receive this information, just as VSP and the members of the National Association of Vision Care Plans have the right to speak and share that information. And then the information is about optometrists who have affiliated with a vision care plan, such as Plaintiff Appellee Dr. Bobby Montgomery. And he's also having his ability to hear and receive information restricted by this law. So we've really tried to cover the waterfront, Your Honor, on bringing a coalition of plaintiffs, each of whom is impacted in slightly different ways by HB 1696. But at the end of the day, just as we indisputably have a proper defendant in the form of the plaintiffs, in the form of VSP and Mr. Montgomery, the speaker and the hearer of the information that's been prohibited here. So we, again, just as with the defendants, we've perhaps been a little over-inclusive, but that's because this is a tremendously important case to the vision care industry and we wanted to make sure that standing and justiciability were established. Your Honor, in the final measure, the district court properly found that it had jurisdiction, including jurisdiction over the Commissioner of Insurance. What is the status of this case in the district court? Your Honor, it is abated due to their sovereign immunity appeal. So Judge Cummings had announced a schedule for summary judgment, cross motions for summary judgment to resolve the case. So they're waiting on us? The district court is waiting on this court to lift the abeyance and to move forward. We've actually filed our motion for summary judgment consistent with the deadline set by the district court. They, in reliance on the abeyance due to the appeal, have not. Thank you. Thank you, Your Honor. We have your argument. Mr. Green? May it please the Court, just a few points in response. I still don't think we have a real answer for the National Press Photographer's case. There is no scintilla of positive enforcement evidence here. So without that, what this really comes down to is an advisory opinion without more development about whether these statutes are constitutional. The Speech First and other cases that they cite are standing cases. And again, National Press Photographer specifically says that those are different. It carves out Ex Parte Young and says you have this additional obligation to show positive enforcement. Book People, which I think I addressed before, but just in case I hadn't, had had affirmative ministerial obligations on the part of the commissioner that was sued in that case that could be enjoined. And there's nothing similar here. The insurance commissioner doesn't have any affirmative steps to carry out the statute that could be enjoined. I think there's been a lot of reliance on our refusal to agree to a non-enforcement during the course of this. Again, I don't think that that constitutes any sort of evidence of affirmative willingness to enforce the statute. I think the commissioner has the right to wait for a consumer complaint that might come in that she might have to then take enforcement action against some of these plaintiffs. And she was not willing to concede that she couldn't do that during the course of this lawsuit. But there's nothing like that here yet. The enforcement letter that they are talking about, again, it's not about the... What do you say about the other side's position that this isn't a consumer statute at all? This is a regulatory economic preference statute. The legislature... It's not... It actually deprives consumers of information. So it's not a consumer statute. So waiting on consumers to suggest things is not what you would be doing. Well, the legislative history we cite is pretty clear that the point of this was to help consumers make better healthcare choices. And we cite that in our brief. You can see it. It's in the bill analysis. It's about making sure that they're getting good information about the choices that are out there. And that is definitely a pro-consumer perspective. By limiting the information about discounts and other things? Limiting false information. But it's not false about a discount. Well, we're arguing that the statute can be construed narrowly to apply to... But you didn't argue that in the district court, did you? We did. Tell me where. We might not have said the words constitutional avoidance, but we absolutely, in our motion to dismiss and preliminary injunction briefing, argued that the statute applies to inherently deceptive speech. It's right there. Again, we just didn't use the words constitutional avoidance, which I may have, you know, used on our appellate... That it only applied to inherently deceptive and did not include discounts and other things? You argued that to the district court? That's how to read the statute, yes. Where? I don't have the pin set, but it's in our motion to dismiss and preliminary injunction briefing. The enforcement letter that they cite about, again, it's not about the provisions of the statute that are at issue in this case. It was about different portions of HB 1696, and the National Press Photographer's case says that you look at enforcement provision by provision. There were some provisions that had been being enforced in that case, but not the ones that were at issue in that case, and so it's provision by provision. I understand standing goes to injury, and here we're looking for evidence of enforcement, but the court, the cases do constantly say there's a lot of overlap, and it would seem to me particularly necessary in a pre-enforcement context where you aren't going to have what you just added. The word positive evidence of enforcement hasn't yet been enforced, so it would seem in that circumstance, we do look to negative implications. Is there a case that says we can't? In other words, someone refusing the stipulation that OGG was willing to give. I don't think that OGG stipulation is necessary. I think that, again, our best case is National Press Photographers. Yeah. And so... Why wouldn't your rule do away with pre-enforcement altogether? Because all these other things would be enforcement steps. Well, again, if they got a letter saying, you know, the commissioners received a complaint about a potential violation of the sections of the law that are issued in this case, and we need you to respond to that, I think that would probably be enough. I think if we had posted a bulletin saying, we are interpreting the statutes to do X, Y, and Z, beware, and they do X, Y, and Z, those are the kind of things that you can point to as positive enforcement steps that are just lacking in this case. So in closing, the court should reverse and direct the district court to dismiss the defendants based on their immunity, but in the alternative, it should reverse the preliminary injunction. Thank you very much. We have your argument. We appreciate the arguments on both sides, and this case is submitted. This concludes this sitting of the court. I appreciate sitting with Judge Higginson and Judge Dennis in this sitting, and we, the court, will stand in recess pursuant to its usual order. Thank you.